## COMMONWEALTH *VS.* CHARLES JAYNES.

No. 00-P-578.

Middlesex. February 14, 2002. - June 21, 2002.

Present: GREENBERG, GRASSO, & KAFKER, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Voir dire, Public trial, Jury and jurors. *Wanton or Reckless Conduct. Jurisdiction,* Of crime. *Constitutional Law,* Public trial, Impoundment order. *Privacy. Jury and Jurors.*

At a murder trial, there was no error creating a substantial risk of a miscarriage of justice in the judge's instructions to the jury on involuntary manslaughter caused by reckless or wanton conduct, where the judge properly instructed on the elements of involuntary manslaughter as well as on the elements of murder in the second degree, where the involuntary manslaughter instruction did not shift the Commonwealth's burden of proof or otherwise detract from the judge's proper malice instruction, and where the two crimes were properly distinguished. [305-308]

At a murder trial, the judge did not err in failing to instruct the jury that the Commonwealth was required to prove beyond a reasonable doubt that criminal acts providing the Commonwealth with jurisdiction to prosecute the defendant for murder had occurred within Massachusetts where, based on the facts of the case, it was neither reasonable nor possible to assume that the victim was not forcibly confined or murdered in Massachusetts. [308-310]

A criminal defendant was not, in the circumstances, denied his constitutional right to a public trial in a murder case, where the judge briefly closed the courtroom to the public, although not to the defendant or his counsel, during parts of the individual voir dire of certain potential jurors who requested that their privacy be protected. [310-313]

A Superior Court judge who impounded the names of certain venire members in a murder case to protect an overriding privacy interest, and who narrowly tailored her solution to protect that interest, acted within her discretion; further, there was no abuse of discretion in the order of a single justice of this court effectuating the trial judge's order. [313-315]

INDICTMENTS found and returned in the Superior Court Department on December 11, 1997.

The cases were tried before *Judith A. Cowin,* J., and a motion for a new trial was heard by *Regina L. Quinlan,* J.

A motion for impoundment was heard in the Appeals Court by *Dreben, J.*

*Ruth Greenberg* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney, for the Commonwealth.

KAFKER, J. The defendant, Charles Jaynes, was convicted by a Superior Court jury of murder in the second degree and kidnapping for his role, along with Salvatore Sicari, in the killing of ten year old Jeffrey Curley.[1] His motion for a new trial was denied. He appeals from his conviction and from the order denying his motion for new a trial. As neither appeal has merit, we affirm his convictions, and decline to order a new trial.

*Facts.* The facts that the jury were warranted in finding were as follows. During the summer and fall of 1997, the defendant, a Brockton native, along with Sicari, befriended the ten year old victim, whom they saw often in parks and on the sidewalks of the victim's East Cambridge neighborhood. Sicari, whom the defendant visited frequently at his home in Cambridge, lived with his mother, a few blocks away from the victim, and near a park where the victim often played. During the fall of 1997, the defendant on several occasions took the victim for rides in his Cadillac, bringing him to a Newton car dealership where the defendant worked, to the Boston Public Library where the defendant's girlfriend worked, and out to dinner. The victim's parents had not granted permission, nor were they aware that the defendant drove their son to places in his car. The defendant was sexually attracted to young boys. His goal in gaining the victim's confidence was to engage in sexual acts with him. The defendant told a friend that if the child refused, Sicari "would take care of him." To achieve this end, the defendant purchased a bicycle for him, and promised he would give it to him, replacing one that had recently been stolen from the victim.

On October 1, 1997, the defendant and Sicari picked up the victim in the defendant's car, as the victim was walking his dog

---

[1]Prior to trial, the judge allowed Sicari's motion to sever his case from the defendant's. Sicari was tried separately and convicted before Jaynes's trial began. Sicari's convictions of murder in the first degree and kidnapping were affirmed on appeal. See *Commonwealth* v. *Sicari,* 434 Mass. 732 (2001), cert. denied, 534 U.S. 1142 (2002).

near Sicari's house, shortly after 3:15 in the afternoon. Sicari and the defendant drove off with the victim. At 3:37 P.M., gasoline was purchased using the defendant's father's credit card at a gas station in Newton.[2] The victim was thereafter smothered to death with a gasoline soaked rag that was held up to his nose and mouth. At 4:46 P.M., at a hardware store in Newton, the defendant purchased duct tape which he subsequently used to secure a large container in which he disposed of the victim's body. An employee at the hardware store testified that the defendant appeared nervous, and smelled of gasoline when he purchased the duct tape and a tarp. Between 5:00 and 5:30 P.M., the defendant went to work at the car dealership in Newton, accompanied by Sicari, but not by the victim. The defendant left work at 8:30 P.M., and at 9:04 P.M., accompanied by Sicari, he purchased a large Rubbermaid container from a Bradlee's store in Watertown. At approximately 10:20 P.M., the defendant and Sicari purchased a bag of lime and a bag of concrete from a Home Depot store in Somerville. They stopped at an Osco drug store in Somerville at 10:38 P.M., where they purchased "No-Doz" and cigars. The victim was reported missing by his mother in the late evening of October 1.

Following their stop at the drug store, the defendant and Sicari traveled to an apartment the defendant rented in Manchester, New Hampshire, where they spent the night. Early on the morning of October 2, the defendant's Cadillac was seen parked at the Great Works River Bridge in South Berwick, Maine, which is located near the border of Maine and New Hampshire. The victim's naked body was discovered in the river inside a large plastic container, sealed with duct tape, on October 7, 1997. An autopsy revealed that the cause of his death was gasoline poisoning from inhalation of gasoline. Redness and swelling on his face and upper body indicated that a gasoline soaked rag had been held over his nose and mouth, quickly suffocating him. Concrete was found at various places on his body.

Sicari's ex-girlfriend, Charlene Letourneau, who testified at the defendant's trial under a grant of immunity from prosecution, stated that she had received multiple telephone calls from

---

[2] This credit card was found in the defendant's wallet.

both Sicari and the defendant on the evening and night of October 1. Neither man mentioned that he was with the other. The defendant repeatedly requested that Letourneau tell his mother, with whom Letourneau resided, not to come to his apartment in New Hampshire that night. Sicari told Letourneau that he was purchasing cement, and that he had a project he needed to finish that night. He hinted that he had killed someone.

On the evening of October 2, the defendant was read his Miranda rights and questioned by Newton and Cambridge police officers after his arrest on outstanding warrants. The arrest followed an altercation at the car dealership in Newton where he worked. He had been confronted while at work that day by Sicari and the victim's brothers, who had accused him of having information about the victim's disappearance. The defendant told the police officers that he had last seen the victim on September 29, 1997, between 2:00 and 2:30 P.M., when he had given the boy a ride to his house in Cambridge. He admitted that he was friendly with the boy and had taken him out in his car without telling the boy's parents. He also admitted he had given the boy money in the past, and had purchased a new bicycle for him for $250. He said that on the evening of October 1, he and Sicari had driven to New Hampshire, had stopped at a rest area off the highway, had had intercourse in the backseat of his car, had fallen asleep, and had driven back to Cambridge the next morning.

The defendant's car was searched and receipts from Bradlee's and Osco were found. On October 3, following a confession by Sicari which implicated the defendant and detailed their actions on the night of the murder, police searched the defendant's Manchester apartment and found lime, as well as the label from a Rubbermaid container. The defendant's finger print appeared on a broken spoon that had been used to mix lime and concrete. Also found in the defendant's apartment was the football jersey worn by the victim when he disappeared. The jersey smelled strongly of gasoline.

*Arguments on appeal.* The defendant raises three issues, each of which, he claims, requires that he be granted a new trial on the charge of murder in the second degree. First, he claims that

the judge misstated the law when she instructed the jury on involuntary manslaughter. Second, he asserts that the judge's failure to give an instruction requiring the Commonwealth to prove that the murder took place within the Commonwealth denied the defendant his due process rights. Third, he contends that he was denied his right to a public trial because the judge briefly closed the courtroom to the public, although not to the defendant or his counsel, during parts of the individual voir dire of certain potential jurors who requested that their privacy be protected. We conclude that each of these arguments is without merit.[3]

a. *Jury instruction on involuntary manslaughter caused by reckless or wanton conduct.* The defendant claims that the judge's instructions on involuntary manslaughter included improper "burden-shifting" language that led to his conviction of murder in the second degree. The defendant concedes that he made no objection to the instruction at trial. We therefore review the challenged instruction to determine whether there was an error that created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Whitman*, 430 Mass. 746, 750 (2000).

We begin with an examination of the specific language challenged by the defendant. After the Commonwealth conceded that an involuntary manslaughter instruction to the jury would not be impermissible, the judge informed counsel that she would instruct on both theories of involuntary manslaughter.[4] Assuming, without deciding, that the defendant was entitled to such an instruction, the instruction given was not legally flawed. The judge's involuntary manslaughter instruction reflected long-standing practice. It also anticipated the instruction approved as

---

[3]The defendant also appeals from an order of a single justice of this court ordering the removal of the names of certain members of the venire from the transcript. See discussion and note 12, *infra*. The appeal from this order has been consolidated with the defendant's direct appeal and his appeal from the order denying his motion for a new trial.

[4]The two theories of involuntary manslaughter are (a) unlawful killing, unintentionally caused by wanton or reckless conduct; or (b) unintentional, unlawful killing as a result of a battery that the defendant knew or should have known endangered human life. See Model Jury Instructions on Homicide 34 (1999). The defendant does not allege error in connection with the judge's second theory of involuntary manslaughter. Nor does he allege error in the murder in the second degree instruction, or in the joint venture instruction.

a model by the Supreme Judicial Court the following year.[5] Finally, the instruction given comported with the language requested by the defendant.[6]

The defendant nonetheless contends that the judge erred when she introduced her discussion of involuntary manslaughter with the following statement: "[T]he Commonwealth here must prove three elements beyond a reasonable doubt in order to prove involuntary manslaughter [by means of] wanton or reckless conduct: one, an unlawful killing; *two, that the death was unintentionally caused*; three, during the commission of wanton or reckless conduct" (emphasis supplied). The judge then elaborated: "The Commonwealth must . . . prove that the death was unintentionally caused during the commission of wanton or reckless conduct. What is an act which constitutes such a disregard of probable harmful consequences to another as to rise to the level of wanton or reckless conduct? Wanton or reckless conduct is conduct producing a high degree of likelihood that substantial harm will result to another." She further explained that "[t]he essence of wanton or reckless conduct is intentional conduct by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another. Wanton or reckless conduct amounts to what has been variously described as indifference to or disregard of probable conse-

_____

[5]The Supreme Judicial Court has approved the following jury instruction on involuntary manslaughter due to wanton or reckless conduct: "To prove involuntary manslaughter, the Commonwealth must prove beyond a reasonable doubt: 1. That the defendant committed an unintentional and unlawful killing of the deceased. To satisfy this element the Commonwealth must prove that the killing was unlawful and that the defendant intended the conduct that caused the death but the Commonwealth need not prove that the defendant intended the death which resulted from the conduct . . . . 2. The killing was caused by wanton or reckless conduct. . . . The essence of wanton or reckless conduct is intentional conduct which either the defendant knew or a reasonable person would have known involved a high degree of likelihood that substantial harm would result to another even though the harm itself may not have been intended. 3. The wanton or reckless conduct caused the death of the deceased." Model Jury Instructions on Homicide 34-35 (footnote omitted).

[6]The instruction requested by the defendant read in part as follows: "Involuntary manslaughter is an unlawful homicide, unintentionally caused . . . by an act which constitutes such a disregard to probably harmful consequences to another as to constitute wanton or reckless conduct."

quences to that other." The judge then instructed that wanton or reckless conduct depends both on what the defendant knew and how a reasonably prudent person would have acted knowing those facts. The judge provided further elaboration consistent with the later adopted model instructions.

Ignoring the judge's accurate statement of the elements of wanton and reckless manslaughter and murder in the second degree, the defendant appears to suggest that the introductory sentence underlined above required the Commonwealth to prove that the killing was unintentional separately from proving the traditional elements of involuntary manslaughter based on wanton and reckless conduct. He also suggests that this requirement led to the jury convicting the defendant of murder in the second degree. It is clear in reviewing the instruction in context, however, that the judge stated that the Commonwealth was required to prove the traditional elements of involuntary manslaughter based on wanton and reckless conduct. The instruction as a whole also distinguished involuntary manslaughter from murder. We are bound to consider the judge's instructions as a whole, and "do not scrutinize bits and pieces removed from their context." *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998) (citation omitted). See *Commonwealth* v. *Repoza*, 400 Mass. 516, 519, cert. denied, 484 U.S. 935 (1987); *Commonwealth* v. *Torres*, 420 Mass. 479, 490 (1995).

In order to connect the contested sentence in the involuntary manslaughter instruction to his conviction of murder in the second degree, the defendant relies heavily on a mistaken analogy to *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998). Given the extensive argument the defendant makes on this point, we address it in some detail. The defendant argues that the judge's introductory, shorthand reference to the Commonwealth's burden of proving that the death was unintentionally caused may have led jurors to convict him of murder in the second degree. He claims that "[r]equiring the Commonwealth to prove lack of intent to kill beyond a reasonable doubt before an involuntary manslaughter verdict can be returned is identical to the recognized error of requiring the Commonwealth to prove provocation beyond a reasonable doubt before a voluntary manslaughter verdict can be returned."

In *Acevedo*, however, the instructional language that shifted the burden of proof on provocation undermined both the instructions on murder and those on voluntary manslaughter. As "malice and adequate provocation are mutually exclusive," the mistaken provocation instruction was critical to the jury's verdicts on either murder or manslaughter. *Id.* at 715-717.[7] Here, however, the judge properly instructed on the elements of involuntary manslaughter as well as on the elements of murder in the second degree. The involuntary manslaughter instruction did not shift the Commonwealth's burden or otherwise detract from the proper malice instruction. The two crimes were properly distinguished. There was no error, *Acevedo*-like or otherwise.[8]

b. *Jurisdiction of the Commonwealth.* Although the issue of territorial jurisdiction was not a live one at trial, the defendant argues that the judge erred in failing to instruct the jury that the Commonwealth was required to prove beyond a reasonable doubt that criminal acts providing the Commonwealth with jurisdiction to prosecute the defendant for murder had occurred within Massachusetts. The defendant did not request such an instruction nor object to the instructions that were given. We conclude no jurisdictional instruction was required. Although the Commonwealth did not offer evidence on the exact time or place of the child's murder, and his body was disposed of in South Berwick, Maine, after the defendant and Sicari spent the

---

[7]Although "[t]he correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation," the trial judge in *Acevedo* failed so to instruct in a case in which the issue of provocation was "plainly presented." See *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998). The judge's instruction "incorrectly told the jury that malice is negated by provocation only if provocation is proved beyond a reasonable doubt." *Ibid.* The defendant argues, in a nonsequitur, that "[s]imilarly, malice is not negated by lack of intent to kill only if the lack of intent to kill is proved beyond a reasonable doubt."

[8]Although we conclude there was no error in the instruction, even if there were we would not hold that it created a substantial risk of a miscarriage of justice. Here, the defendant's argument is based on a stray, innocuous sentence surrounded by eighty-six pages of uncontested instructions. Furthermore, the jury submitted no question indicating that they were struggling with the elements of involuntary manslaughter in the course of their deliberations. Finally, the evidence presented at trial was more than adequate to warrant a conviction of murder in the second degree.

night in New Hampshire, there was conclusive evidence of the kidnapping of the child in Middlesex County, and all of the circumstantial evidence pointed to Massachusetts as the site of the murder. In these circumstances, particularly where no such instruction had been requested, the judge had no obligation to provide a jurisdictional instruction.

In *Commonwealth* v. *Adelson*, 40 Mass. App. Ct. 585, 589 (1996), a case in which the issue was expressly raised in a pretrial motion to dismiss, this court held that "[m]erely because the defendant raised the issue of jurisdiction does not automatically entitle him to have the issue submitted to the jury." Where "[n]one of the relevant facts as developed during the trial [gives] rise to a 'reasonable and possible' inference [that the relevant conduct took place] outside the confines of Massachusetts . . . the issue was properly within the province of the judge, as matter of law." *Id.* at 590.

Under G. L. c. 277, § 62, the Commonwealth has jurisdiction to prosecute a defendant for murder, even in cases in which the victim's death occurs outside the Commonwealth, when the violence or injury leading to the victim's death is begun in the Commonwealth. See *Commonwealth* v. *Lent*, 420 Mass. 764, 769 (1995). General Laws c. 277, § 62, provides: "If a mortal wound is given, or if other violence or injury is inflicted, or if poison is administered, in any county of the commonwealth, by means whereof death ensues without the commonwealth, the homicide may be prosecuted and punished in the county where the act was committed." Kidnapping, at least where accompanied by the binding of the victim and his forceful confinement, see G. L. c. 265, § 26, has been held to include the requisite violence to the victim to confer jurisdiction on the Commonwealth under G. L. c. 277, § 62. See *ibid*; *Commonwealth* v. *Travis*, 408 Mass. 1, 8 (1990).

In the instant case, the facts related to jurisdiction establish indisputably that the kidnapping of the ten year old victim began shortly after 3:00 P.M. near his home in Cambridge. The evidence included testimony from various witnesses who saw the defendant and Sicari after 3:15 P.M. in Massachusetts but did not see the victim. A receipt showed a purchase of gasoline at 3:37 P.M. in Newton on the defendant's father's credit card, later

found in possession of the defendant. There was testimony that the defendant was observed at approximately 4:46 P.M. in Newton, agitated and smelling of gasoline; the victim died from gasoline inhalation. The defendant showed up with Sicari for work in Newton sometime between 5:00 and 5:30 P.M., again without the victim in sight. Other receipts showed a purchase at 9:04 P.M. in Watertown of a large plastic container subsequently used to dispose of the victim's body, and the purchase at approximately 10:20 P.M. in Somerville of a fifty pound bag of concrete. Concrete was found on the victim and in the container sunk in the river in Maine. The defendant and Sicari also bought "No-Doz" and cigars at 10:38 P.M. in Somerville. The medical examiner testified that the contents of the victim's stomach indicated a time of death before 10:30 P.M.[9]

Based on the facts discussed above, it is not reasonable nor possible to assume that the victim was not forcibly confined or murdered in Massachusetts, given the evidence presented at trial concerning what occurred between 3:00 P.M. and 10:38 P.M. in Massachusetts. In these circumstances, no jurisdictional instruction was required.

c. *Closing of the courtroom during voir dire of certain venire members.* At a pretrial conference on November 25, 1998, the judge announced that she would "inform the venire as a whole that I will be asking them individually questions about prior sexual abuse, their attitudes about gay or homosexual people, and their biases or prejudices regarding people of different races. And if anyone has a privacy issue regarding that concern, to inform the Court so that the courtroom can be closed during such questioning." The defendant, who had requested that these

---

[9]The autopsy revealed that there were undigested noodles in the victim's stomach. There was evidence that the victim's mother fed him noodles at approximately 11:00 A.M. on the day of his disappearance, and the Commonwealth's medical expert opined that the state of decomposition of the noodles in the victim's stomach was consistent with a time of death between 3:15 P.M. and 10:30 P.M. on October 1. The defendant contests this evidence of the time of death on the grounds that no testimony was offered regarding whether the noodles in the victim's stomach were the same type as those given to him by his mother, and that digestion may be slowed in people suffering from or recovering from the flu, as the victim was on the date of his disappearance.

questions be asked of all potential jurors, made no objection, nor did he when the judge announced the plan to the venire.

During jury selection, the judge explained to potential jurors that, "If I find that your privacy issue is a legitimate one, I will continue the individual questioning on issues that involve privacy in a closed courtroom . . . . If I should find that your concern with privacy is not genuine or does not raise a legitimate privacy issue, then I will conduct the entire individual questioning in public." Sixteen potential jurors requested privacy in response to the judge's statement. The judge closed the courtroom only when a potential juror requested closure, and only during the discussion of the private matter. Of the sixteen, two were eventually selected for the jury.[10] The judge found it unnecessary to close the courtroom for one of the two selected jurors who requested privacy, because no member of the public was present. Defense counsel declared himself satisfied with both of the jurors selected for the jury who had requested privacy during voir dire.

The defendant argues that closure of the courtroom during certain parts of the voir dire violated his constitutional right to a public trial. There is no question that the right to a public trial extends to both the defendant and the public, and covers "the voir dire examination of potential jurors concerning their qualifications to serve." *Commonwealth* v. *Horton*, 434 Mass. 823, 832 (2001), quoting from *Commonwealth* v. *Gordon*, 422 Mass. 816, 823 (1996). The defendant, however, was present during the individual voir dire and had access to the jury questionnaire containing the names and other pertinent information for each individual to be questioned. Furthermore, "[t]he principal concern behind the requirement of a public trial is the assurance of fairness. . . . [Yet the defendant] does not allege

---

[10]Of the others, eight were excused for cause, including four who said they or their children had been sexually abused, one who stated, "I have a problem with the defendant," one who said evidence concerning rape of a child would affect her, one who worked at a hotel near the courthouse, and one who disclosed racial bias. One juror was excused due to hardship, and three others were challenged by the Commonwealth. They included one whose wife worked at the courthouse and had been sexually abused as a child, one who thought she might have been sexually abused as a child, and one whose brother was gay. Two other potential jurors were not reached.

that the jury selection process was unfair in any respect, let alone identify some form of unfairness that would have been prevented had the voir dire been conducted" completely in public. *Commonwealth* v. *Horton, supra.* He also never objected to the process at trial.

In this context, there is a serious question whether the defendant has "demonstrated that he has standing to press this right of the public," which is "distinct" from his own public trial right. *Id.* at 833. The standing issue, however, was not fully briefed by the parties.[11] Assuming, without deciding, that the defendant has standing to challenge the closure of the courtroom, we conclude that the trial judge did not err in closing the courtroom.

There is .a strong "presumption of openness" in court proceedings. See *Press-Enterprise Co.* v. *Superior Ct. of Cal.,* 464 U.S. 501, 510 (1984). "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Ibid.*

The judge here followed the procedure approved by the United States Supreme Court when she permitted prospective jurors to make an affirmative request for privacy during voir dire. See *id.* at 512 ("To preserve fairness and at the same time protect legitimate privacy, a trial judge . . . should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record"). Furthermore, the interests of individual members of the venire in maintaining their privacy while providing the court and the parties extremely sensitive information about their beliefs and life experiences was an overriding one. The judge's

---

[11]The Commonwealth alluded to the question of whether the defendant has standing to assert the interests of the public under the First Amendment to the United States Constitution. We need not, and do not, consider the issue.

balancing of the competing interest in a public trial was appropriate and her solution to the problem narrowly tailored: she allowed the courtroom to be closed in response only to specific requests made by potential jurors to protect their privacy, and only during the discussion of private matters; she immediately reopened the courtroom for any additional questioning of each of the potential jurors once questioning on the private matters was completed. She also adequately articulated the basis for the brief closures in order to permit meaningful appellate review. See *Press-Enterprise Co.* v. *Superior Ct. of Cal.*, 464 U.S. at 510. We conclude that the defendant's arguments on this issue have no merit.

d. *Impoundment of names of certain venire members.* When the trial judge informed jurors that they could request privacy during individual questioning, she also told them that if she found their privacy issues legitimate, although a transcript would eventually be released of the questioning, "your names will have been removed from the transcript." The defendant did not object to the judge's statement. Following trial, the Commonwealth's motion to impound the names of fourteen jury members was allowed by a single justice of this court, "on the basis that the jurors were told by the trial judge that this would be done."[12] We review a judge's impoundment orders "to determine whether they constitute an abuse of discretion or are legally erroneous." *Newspapers of New England, Inc.* v. *Clerk-Magistrate of the Ware Div. of the Dist. Ct. Dept.*, 403 Mass. 628, 629 (1988), cert. denied, 490 U.S. 1066 (1989).

---

[12]The defendant next sought relief from a single justice of the Supreme Judicial Court, who ruled that the trial judge "intended that the names of those jurors for whom she conducted an individual voir dire in a closed courtroom were to be stricken when the transcript was prepared. Her order was complete, and only remained to be carried out by the court reporter at such time that the transcript was prepared." While the defendant's appeal of the single justice order was pending before the full Supreme Judicial Court, a motion to consolidate the impoundment matter with the defendant's other pending appeals in this court was allowed. On May 8, 2002, the Supreme Judicial Court affirmed the single justice's decision denying the defendant relief, concluding, "the appropriate avenue of review is an appeal to a panel of the Appeals Court." See *Jaynes* v. *Commonwealth*, 436 Mass. 1010, 1011 (2002). See *Kordis* v. *Appeals Court*, 434 Mass. 662, 669 (2001) (when single justice of Appeals Court rules on impoundment matter in first instance, ruling is reviewable by Appeals Court panel).

The trial judge again followed the guidance set out in *Press-Enterprise Co.* v. *Superior Ct. of Cal.*, 464 U.S. at 512: "When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests. Even then a valid privacy right may rise to a level that part of the transcript should be sealed, *or the name of a juror withheld, to protect the person from embarrassment*" (emphasis supplied). As discussed in part c, *supra*, the judge acted to protect an overriding privacy interest and narrowly tailored her solution to protect that interest. See *id.* at 510.

The privacy concerns of the potential jurors in the instant case could hardly be more compelling. On the other hand, the presence or absence of the particular names in the transcript seems to be at most of only tangential relevance to the purposes of a public trial. See *Commonwealth* v. *Patry*, 48 Mass. App. Ct. 470, 474 (2000). The defendant's interests are even less clear.[13] See generally *Commonwealth* v. *Horton*, 434 Mass. at 832-833. This is not a case, for example, in which a posttrial investigation of the jurors raising questions regarding the integrity of the verdict has been sought by either side, thereby possibly making the names relevant to the parties or the public. See *Commonwealth* v. *Fidler*, 377 Mass. 192, 200-203 (1979); *Commonwealth* v. *Guisti*, 434 Mass. 245, 249-250 (2001). Nor is this a case in which individual venire members' names were kept from the defendant. Compare *Commonwealth* v. *Anguilo*, 415 Mass. 502, 520-529 (1993).

Finally, the judge here articulated and memorialized on the record and in the public transcript the bases of her decision to impound the names. In these circumstances, the judge's decision to impound juror names was within her discretion and not erroneous. See *Newspapers of New England*, 403 Mass. at 629. There was likewise no abuse of discretion in the order of the

---

[13]As there was concerning the closure of the courtroom during voir dire, there is a serious question — one we need not decide — whether the defendant even has standing to raise the issue. See *Commonwealth* v. *Horton*, 434 Mass. at 823, 832-833. The standing question has not been briefed by the parties.

single justice of this court effectuating the trial judge's order. See S.J.C. Rule 1:15, as appearing in 401 Mass. 1301 (1988).

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

*Order of the single justice affirmed.*