189 P.3d 245 (2008)
STATE of Washington, Respondent,
v.
David Lee ERICKSON, Appellant.
No. 35628-7-II.
Court of Appeals of Washington, Division 2.
July 29, 2008.
*246 David Bruce Koch, Andrew Peter Zinner, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.
Karen Anne Watson, Pierce County Prosecutor's Office, Tacoma, WA, for Respondent.
HOUGHTON, P.J.
¶ 1 David Erickson appeals his conviction of two counts of first degree child rape. He argues that the trial court denied him his constitutional right to public trial by allowing private questioning of prospective jurors. We reverse and remand for a new trial.[1]

FACTS
¶ 2 The State charged Erickson with two counts of first degree child rape. Before *247 trial, the court asked whether the parties wanted to give the prospective jurors a questionnaire before beginning voir dire. The prosecutor responded, "I'm hopeful that [defense counsel] and I can agree on one that we can present to the Court. We both drafted one that we exchanged, and I think they're pretty similar. I haven't had an opportunity to discuss that with [defense counsel]." II Report of Proceedings (RP) at 179. Defense counsel replied, "I don't think that will be a problem, Your Honor. I will probably add some questions, based on what [the prosecutor] had, and I don't think [the prosecutor's] got major problems about questions that I had." II RP at 179. The trial court then replied:
I guess the main [questions] from my perspective, are that you have a list of witnesses in there so the jurors can respond to that; that you ask them whether or not there's any reason that they might not be fair and impartial so we get that kind of broad, general question in. Give them a suggested time frame which is liberal, and be sure they can accommodate us for the time frame, and factor in some deliberation time into that. And then ask them whether or not any of them want to be talked to privately so we get an idea as to how many of those we might have.
II RP at 179.
¶ 3 The next day of the proceedings, before the prospective jurors' orientation, the trial court noted that the questionnaire "looked good." III RP at 185. During discussion on the matter, the prosecutor mentioned, "I suspect that there's going to be a number of people who want to talk in private." III RP at 188. Erickson's counsel did not object and acquiesced to the trial court's decision to begin any private questioning of individual prospective jurors after their orientation.
¶ 4 After the prospective jurors answered the questionnaire, the judicial assistant notified the trial court and counsel that according to prospective jurors' answers to the questionnaire, three individuals wanted to be questioned privately. During the trial court's orientation, it told the prospective jurors, "You have the option to ask to have your questions asked and answered with fewer people present. . . . [I]t's certainly possible that the answers may involve an area that you are uncomfortable talking about in front of such a large group." III RP at 260.
¶ 5 Later, the trial court asked whether any prospective jurors wanted to be examined privately. Four individuals wished to do so. Except for those four, the trial court excused the rest of the prospective jurors from the courtroom and proceeded with counsel and the court reporter to the jury room. Once there, the trial court called each prospective juror into the jury room individually, and both sides questioned each individual. Three of the prospective jurors described personal experiences with sexual abuse or assault, while the fourth suggested he knew defense counsel.
¶ 6 During the interviews in the jury room, the trial court denied Erickson's challenges for cause directed toward two prospective jurors and excused the prospective juror who knew defense counsel. The trial court later excused one of these four prospective jurors for unrelated reasons. Erickson later exercised peremptory challenges against the other two prospective jurors whom the parties had questioned in the jury room.
¶ 7 The jury found Erickson guilty of both counts. He appeals.

ANALYSIS
¶ 8 Erickson contends that the trial court denied him his constitutional rights. He asserts that moving individual prospective jurors in the jury room for private questioning violated his right to a public trial.
¶ 9 We review de novo whether a trial court procedure violates the right to a public trial. State v. Brightman, 155 Wash.2d 506, 514, 122 P.3d 150 (2005). We presume prejudice where the court proceedings violate this right. State v. Rivera, 108 Wash.App. 645, 652, 32 P.3d 292 (2001). A defendant's failure to object at the time of a courtroom closure does not waive this right. Brightman, 155 Wash.2d at 514-15, 122 P.3d 150. The remedy for such a violation is to reverse and remand for a new trial. In the Pers. Restraint of Orange, 152 Wash.2d 795, 814, 100 P.3d 291 (2004).
*248 ¶ 10 The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution each guarantee a criminal defendant the right to a public trial. State v. Russell, 141 Wash.App. 733, 737-38, 172 P.3d 361 (2007). Additionally, article I, section 10 of the Washington Constitution states, "Justice in all cases shall be administered openly," which provides the public itself a right to open, accessible proceedings. Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 36, 640 P.2d 716 (1982).
¶ 11 Article I, Section 10's guarantee of public access to proceedings and article I, section 22's public trial right together perform complementary, interdependent functions that assure the fairness of our judicial system.[2]State v. Bone-Club, 128 Wash.2d 254, 259, 906 P.2d 325 (1995); see also State v. Easterling, 157 Wash.2d 167, 187, 137 P.3d 825 (2006) (Chambers, J., concurring) ("[T]he constitutional requirement that justice be administered openly is not just a right held by the defendant. It is a constitutional obligation of the courts.").
¶ 12 The right to public trial helps ensure a fair trial, reminds officers of the court of the importance of their functions, encourages witnesses to come forward, and discourages perjury. Brightman, 155 Wash.2d at 514, 122 P.3d 150. The public's access to jury selection is important, not only to the parties but also to the criminal justice system itself. Orange, 152 Wash.2d at 804, 100 P.3d 291. A closed jury selection process prevents a defendant's family from contributing their knowledge or insight during jury selection. Brightman, 155 Wash.2d at 515, 122 P.3d 150. And closure also prevents other interested members of the public, including the press, from viewing the proceedings.
¶ 13 Protection of the right to public trial requires a trial court "to resist a closure motion except under the most unusual circumstances." Bone-Club, 128 Wash.2d at 259, 906 P.2d 325. A trial court may close a courtroom only after considering the five requirements enumerated in Bone-Club and entering specific findings on the record to justify the closure order.[3] 128 Wash.2d at *249 258-59, 906 P.2d 325. A trial court's failure to undertake the Bone-Club analysis, which directs the trial court to allow anyone present an opportunity to object to the closure, undercuts the guarantees enshrined in both article I, section 10 as well as article I, section 22. 128 Wash.2d at 258-59, 906 P.2d 325.
¶ 14 Erickson argues that the trial court's relocation of a portion of voir dire to the jury room violated his right to public trial. Relying on a Division Three case, State v. Frawley, 140 Wash.App. 713, 167 P.3d 593 (2007), Erickson asserts that the trial court's decision to move interviews of prospective jurors into the jury room "prohibit[ed] the public from observing this examination." Appellant's Br. at 5. The Frawley court held that conducting interviews of prospective jurors in the jury room is equivalent to a courtroom closure. 140 Wash.App. at 720, 167 P.3d 593. See also State v. Duckett, 141 Wash.App. 797, 809, 173 P.3d 948 (2007) (a Division Three case following Frawley and holding that a trial court must undertake the Bone-Club analysis before questioning prospective jurors individually in a jury room). Because the trial court did not undertake the necessary Bone-Club analysis on the record, Erickson argues that the trial court violated his public trial right.
¶ 15 The State urges us to follow a Division One case, State v. Momah, 141 Wash.App. 705, 171 P.3d 1064 (2007).[4] In Momah, the court held that individual questioning of prospective jurors in chambers and in the jury room does not constitute a closure, making a Bone-Club analysis unnecessary.
¶ 16 In this case, the trial court excused prospective jurors from the courtroom and proceeded with counsel and the court reporter to the jury room, where both sides questioned prospective jurors individually about their answers to a questionnaire.[5] Thus, we must decide whether a trial court must undertake a Bone-Club analysis before individual questioning of prospective jurors outside the courtroom or in the jury room.
¶ 17 The process of jury selection lies within the ambit of the right to a public trial. Brightman, 155 Wash.2d at 511, 515, 122 P.3d 150. Thus, if private questioning of prospective jurors in a jury room acts as a courtroom closure, Bone-Club mandates findings to support such an action by the trial court. 128 Wash.2d at 259-60, 906 P.2d 325.
¶ 18 In Brightman, the trial court ordered a full courtroom closure during jury selection. 155 Wash.2d at 511, 122 P.3d 150. The trial court, sua sponte, told the attorneys that during jury selection the courtroom would be too full of prospective jurors and would pose a security risk if observers, witnesses, and friends and relatives of the victim and defendant remained.[6]Brightman, 155 Wash.2d at 511, 122 P.3d 150. Our Supreme Court disagreed and reversed and remanded for a new trial based on the trial court's failure to engage in the Bone-Club analysis before closing the courtroom. *250 Brightman, 155 Wash.2d at 518, 122 P.3d 150.
¶ 19 Although the Brightman court noted that trivial closures may not violate a defendant's public trial right, the court made evident that its understanding of "trivial" derived from federal cases where "brief and inadvertent" closures had no real affect on the conduct of the proceedings. 155 Wash.2d at 517, 122 P.3d 150.
¶ 20 In Peterson, the trial court, on motion, closed the courtroom so that an undercover officer could testify but inadvertently left the courtroom closed for 15-20 minutes of the defendant's testimony. Peterson v. Williams, 85 F.3d 39, 41-42 (2d Cir.1996). In Al-Smadi, court security officers closed federal courthouse doors at the usual time of 4:30 P.M., 20 minutes before the close of a trial's proceedings at 4:50 P.M. United States v. Al-Smadi, 15 F.3d 153, 154 (10th Cir. 1994). And in Snyder, during counsels' arguments to the jury, a bailiff refused to allow persons to enter or leave the courtroom. Snyder v. Coiner, 510 F.2d 224, 230 (4th Cir.1975). Such condition was brief, quickly changed by the trial court, and placed no restrictions on any of the trial's participants or observers. Snyder, 510 F.2d at 230.
¶ 21 In none of these federal cases did the circuit courts of appeals find a violation of the Sixth Amendment public trial right. In other words, the closures in the federal cases the Brightman court cited were too "trivial" to warrant such a conclusion. 155 Wash.2d at 517, 122 P.3d 150. In light of those cases, the private questioning of jurors, even if done to protect jurors' privacy or to elicit more truthful or forthright answers during voir dire regarding their ability to serve, is more than trivial in terms of its effect on the proceedings. Nor is an intentional decision to remove private questioning of jurors to a place outside the presence of the public "brief and inadvertent." Brightman, 155 Wash.2d at 517, 122 P.3d 150.
¶ 22 Because the decision to remove individual questioning of prospective jurors outside the courtroom has more than an inadvertent or trivial impact on the proceedings, we hold that it acts as a closure for purposes of Bone-Club. Individual questioning of prospective jurors in a jury room acts as a closure because it is improbable that a member of the public would feel free and welcome to enter a jury room of his or her own accord. Also, removing the proceedings makes it difficult, if not impossible, for a criminal defendant's family or friends, or any other member of the public, to view the entirety of the jury selection process. Most courts have jury rooms and chambers adjacent to, but separate from, the courtroom.[7]
¶ 23 Obviously, there are times when a courtroom closure is appropriate. But it is not the public's responsibility to safeguard these rights; it is the responsibility of the courts to take the appropriate steps under Bone-Club to ensure and protect the defendant's and the public's right to open proceedings before any courtroom closure. 128 Wash.2d at 258-59, 906 P.2d 325.
¶ 24 Although a trial court would understandably want to protect prospective jurors' privacy during jury selection, we agree with Frawley, and more specifically with Duckett, insofar as they require a Bone-Club analysis before private questioning of prospective jurors outside the courtroom. See Duckett, 141 Wash.App. at 809, 173 P.3d 948; Frawley, 140 Wash.App. at 720-21, 167 P.3d 593. These cases' approach to this issue comports with our understanding of Brightman.
¶ 25 In Frawley, the trial court conducted voir dire of individual jurors in the judge's chambers outside the presence of the public. 140 Wash.App. at 718, 167 P.3d 593. Before the questioning began, the trial court did not ask the defendant whether he specifically wished to waive his public trial right, nor did the trial court ask those in the courtroom whether anyone would waive the public trial right. Frawley, 140 Wash.App. at 718, 167 P.3d 593. The Frawley court discerned no material distinction between private questioning of prospective jurors and general voir dire of the jury panel. 140 Wash.App. at 720, 167 P.3d 593. Reversing the defendant's conviction and remanding for new trial due to *251 the trial court's failure to engage in a Bone-Club analysis, the Frawley court noted that denial of the right to a public trial "`is one of the limited classes of fundamental rights not subject to harmless error analysis.'" 140 Wash.App. at 721, 167 P.3d 593 (quoting Easterling, 157 Wash.2d at 181, 137 P.3d 825).
¶ 26 Duckett involved a scenario nearly identical to the present case. During voir dire, the court questioned a number of prospective jurors individually in the jury room, based on their responses to a questionnaire. Duckett, 141 Wash.App. at 800, 173 P.3d 948. Also, the trial court did not perform a Bone-Club inquiry. Duckett, 141 Wash.App. at 805, 173 P.3d 948. Division Three overturned the case, deciding that "[t]he closure here was deliberate, and the questioning of the prospective jurors concerned their ability to serve; this cannot be characterized as ministerial in nature or trivial in result." Duckett, 141 Wash.App. at 809, 173 P.3d 948.
¶ 27 We agree with the principle stated in Duckett, that "the guaranty of a public trial under our constitution has never been subject to a de minimus exception." 141 Wash. App. at 809, 173 P.3d 948. Even though one can articulate pragmatic and salutary reasons for moving voir dire outside the courtroom in certain circumstances, such a course of action requires the trial court to engage in a Bone-Club inquiry before doing so. Because the trial court did not do so here, it violated Erickson's right to a public trial.
¶ 28 In sum, the trial court erred in not performing the five-part Bone-Club inquiry before its decision to move voir dire questioning of four prospective jurors into the jury room.[8] As Erickson's failure to object to the process does not constitute a waiver[9] and because we presume prejudice, we reverse and remand for a new trial. Brightman, 155 Wash.2d at 514-15, 122 P.3d 150.; Rivera, 108 Wash.App. at 652, 32 P.3d 292.
¶ 29 Reversed and remanded for new trial.
I concur: BRIDGEWATER, J.
QUINN-BRINTNALL, J. (dissenting).
¶ 30 I disagree with the majority's decision to review the public trial right on the merits and, therefore, respectfully dissent. The majority holds that privately interviewing four prospective witnesses who were never seated on the jury was a courtroom closure that violated David Erickson's and the public's right to a public trial. Although I agree that trial courts have a duty to apply the Bone-Club[10] factors before closing a courtroom, in my opinion Erickson invited this error and may not now complain that his personal public trial right was violated. Moreover, Erickson does not have standing to assert the public's right.
¶ 31 Initially, I note that Erickson invited any error regarding his personal right to a public trial. Under the invited error doctrine, a court should decline to review a claimed error if the appealing party induced the court to err. State v. Henderson, 114 Wash.2d 867, 870, 792 P.2d 514 (1990). This invited error doctrine applies even to manifest constitutional errors. State v. McLoyd, 87 Wash.App. 66, 70, 939 P.2d 1255 (1997). Here, Erickson submitted a jury questionnaire in which he asked potential jurors whether they wanted private interviews. Erickson agreed with the trial court's decision to begin private interviews of jurors. Then, Erickson and the prosecutor proceeded to privately interview the four potential jurors who wanted to answer certain questions in a private forum. By submitting the jury questionnaire and conducting private questioning without objection, Erickson agreed that the courtroom should be "closed" for this very limited purpose and very short duration. Cf. *252 In re Pers. Restraint of Orange, 152 Wash.2d 795, 825, 827, 100 P.3d 291 (2004) (Madsen, J., concurring, and Ireland, J., dissenting) (noting that de minimis courtroom closures do not violate public trial rights); see also State v. Easterling, 157 Wash.2d 167, 180-81, 137 P.3d 825 (2006); State v. Brightman, 155 Wash.2d 506, 517, 122 P.3d 150 (2005) (declining to rule on whether de minimis courtroom closures implicate the right to a public trial). He should not now be heard to complain that the closure he requested was improper.
¶ 32 The invited error doctrine is an important aspect of our appellate process that was crafted to prevent the injustice of a party benefiting from an error that he caused or should have prevented. City of Seattle v. Patu, 147 Wash.2d 717, 720, 58 P.3d 273 (2002). In my opinion, such an injustice could be prevented today by applying the doctrine. The doctrine's application makes particular sense here, where the trial court understandably did not believe it was closing the courtroom, no one objected or even mentioned closure, and there are extremely strong public interests in allowing private interviews of potential jurors on matters of sexual abuse.
¶ 33 Erickson argues that if this court determines that he invited this error, then he received ineffective assistance of counsel I strongly disagree. Counsel is not ineffective for making tactical decisions. State v. Cienfuegos, 144 Wash.2d 222, 227, 25 P.3d 1011 (2001) (quoting State v. Hendrickson, 129 Wash.2d 61, 77-78, 917 P.2d 563 (1996)). Where, as here, the defendant needs to inquire into potential jurors' sexual experiences, the parties have fundamentally important reasons to allow potential jurors to answer such questions privately. Regarding sexual abuse, privacy is essential to encourage candid and truthful answers. Candid and truthful answers are essential to allow an attorney to soundly exercise challenges to the jury pool, thus ensuring an unbiased and unprejudiced jury. And the right to an unbiased and unprejudiced jury is an essential component of a defendant's constitutional right to a fair trial. State v. Davis, 141 Wash.2d 798, 824, 10 P.3d 977 (2000). As the record here revealed, three of the jurors who wanted private interviews admitted that they were sexual abuse victims. This is just the sort of candor that attorneys require to ensure a fair trial and are not likely to achieve without privacy. Erickson's counsel was not ineffective for suggesting and agreeing to conduct private questioning on these delicate issues.
¶ 34 The remaining question is whether Erickson has standing to invoke the public's right to a public trial. I would hold that he does not.[11] The standing doctrine generally prohibits a party from suing to vindicate another's rights. Haberman v. Wash. Pub. Power Supply Sys., 109 Wash.2d 107, 138, 744 P.2d 1032, 750 P.2d 254 (1987), dismissed, 488 U.S. 805, 109 S.Ct. 35, 102 L.Ed.2d 15 (1988). Apparently, our Supreme Court has never been asked to rule on whether a criminal defendant may assert the public's right to a public trial, although it has ruled on the public's right through a criminal defendant's appeal.[12]State v. Bone-Club, 128 Wash.2d 254, 259, 906 P.2d 325 (1995). Article I, section 10 of the Washington Constitution sets forth the public's right to the open administration of justice, including the right to public trials. Bone-Club, 128 Wash.2d at 259, 906 P.2d 325. Members of the publicincluding courtroom spectators, members of the media who wish to cover the *253 trial, and even an attorney in his or her individual capacityare proper parties to appeal courtroom closure under this constitutional provision. Erickson is not arguing that he was excluded from the courtroom. He was not. And he does not claim that he stands in the public's shoes here. He does not.
¶ 35 More importantly, this is not a situation in which the defendant's and the public's right to public trial are aligned to the degree that the defendant can fairly represent the public's interests in exercising its public trial rights. Rather, here, those rights conflict. As demonstrated at trial, Erickson had a strong interest to hold private interviews in order to encourage potential juror's candor while protecting them from the embarrassment inherent in discussing publicly, perhaps for the first time and under oath, the sexual abuse they suffered. Private voir dire in sexual abuse cases gives the defendant a tactical advantage and is crucial to protect his constitutional right to fully participate in selecting an unbiased and unprejudiced jury.
¶ 36 The public, in contrast, had an interest to know about the jury proceedings, learn how and why potential jurors were challenged, and oversee the trial to prevent and discover any abuses in the legal system.[13] Erickson was present and benefited from private voir dire; he did not represent the public's interests in this case. In other circumstances where the defendant's and public's trial rights conflict, the defendant's rights and prerogatives generally trump the public's rights and prerogatives. For example, the defendant may waive his rights to a speedy trial, a jury, and a trial without regard to the public's interests except to the extent that court rules and legislation embody those public interests.[14] Our high court has made these rulings despite the fact that our constitution announces the public's right that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." WASH. CONST. art. I, § 10. I would hold that the defendant's and public's interest in a public trial are not sufficiently aligned here to grant Erickson standing to assert that the proceedings violated the public's right under article I, section 10.
¶ 37 In summary, I would hold that Erickson invited the error alleged regarding his personal right to a wholly public jury trial, his attorney employed sound jury selection tactics to ensure his right to a fair trial, and Erickson does not have standing to represent the public's interest in a public trial. Accordingly, I respectfully dissent.
NOTES
[1] Because we reverse and remand for a new trial, we do not address Erickson's other assignments of error that involve sentencing conditions, the trial court's admission of certain items into evidence, and ineffective assistance of counsel.
[2] The dissent suggests that Erickson lacks standing to invoke the public's right to a public trial. Dissent at 252. The dissent further states that Erickson's interest in full candor during questioning conflicts with the public's interest in open proceedings, and thus he cannot "fairly represent the public's interests in exercising its public trial rights" under article I, section 10. Dissent at 253. We disagree.

As noted in State v. Bone-Club, 128 Wash.2d 254, 259, 906 P.2d 325 (1995), article I, section 10 and article I, section 22 are interdependent means of ensuring the fairness of our judicial system. The five-part Bone-Club inquiry itself contemplates the conflict between constitutional protections and the need for closure in certain circumstances. According to the Bone-Club court, "[T]he five criteria a trial court must obey to protect the public's right of access before granting a motion to close are likewise mandated to protect a defendant's right to public trial." 128 Wash.2d at 259, 906 P.2d 325 (emphasis added). Regardless whether Erickson has standing under article I, section 10, he did not ask the trial court to close the courtroom. He merely acquiesced to the trial court's proposal and Erickson's failure to object does not waive his right to public trial under article I, section 22. Brightman, 155 Wash.2d at 517, 122 P.3d 150. Furthermore, helping shape a questionnaire before beginning voir dire does not indicate his desire to move the proceedings out of the courtroom.
Although we note that a courtroom closure requires a Bone-Club analysis, here the trial court could have followed a different procedure not implicating Bone-Club. It had already excused all other prospective jurors from the courtroom; questioning of individual jurors regarding sensitive topics separate from other prospective jurors could have then taken place in open court. See State v. Vega, ___ Wash.App. ___, 184 P.3d 677, 678-79 (2008). Such an approach is not a closure of the courtroom and it secures the right to a public trial.
[3] Relying on Allied Daily Newspapers v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993), the Bone-Club court articulated five criteria to "assure careful, case-by-case analysis of a closure motion":

1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
4. The court must weigh the competing interests of the proponent of closure and the public.
5. The order must be no broader in its application or duration than necessary to serve its purpose.
128 Wash.2d at 258-59, 906 P.2d 325.
[4] After granting review on the public trial issue in Momah, the Washington Supreme Court heard oral argument on the case on June 10, 2008. State v. Momah, 163 Wash.2d 1012, 180 P.3d 1291 (2008).
[5] Although the dissent suggests that Erickson submitted the juror questionnaire, our review of the record indicates that before beginning voir dire, the trial court and the parties agreed together to formulate appropriate questions to include in a questionnaire. Further, it appears the trial court made the decision to move questioning of the prospective jurors into the jury room after the questionnaire was formulated. Thus, we disagree with the dissent's suggestion that Erickson in effect "requested" a courtroom closure making his public trial argument subject to the invited error doctrine. Dissent at 252.
[6] The record before the Brightman court did not make clear whether the trial court actually followed through on its statement to the attorneys, but the court decided that "once the plain language of the trial court's ruling imposes a closure, the burden is on the State to overcome the strong presumption that the courtroom was closed." 155 Wash.2d at 516, 122 P.3d 150. The State did not present evidence to overcome the presumption that closure occurred during jury selection. Brightman, 155 Wash.2d at 516, 122 P.3d 150.
[7] Moreover, a person entering a courtroom and not finding the trial court, counsel, and the court reporter present might not discern that the trial was proceeding.
[8] We again note that the better practice is to question individual jurors regarding sensitive topics separate from the rest of the prospective jurors, but within the courtroom. See Vega, 184 P.3d at 679. Such an approach is not a closure of the courtroom and thus requires no Bone-Club analysis.
[9] Nor does Erickson's assistance in drafting a juror questionnaire before beginning voir dire and before the trial court called prospective jurors into the jury room constitute a waiver under these facts.
[10] State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995).
[11] I am aware of a recent holding to the contrary. See State v. Duckett, 141 Wash.App. 797, 804-05, 173 P.3d 948 (2007).
[12] Cases outside this jurisdiction are similarly unhelpful. See Hutchins v. Garrison, 724 F.2d 1425, 1432 (4th Cir.1983) (assuming, in arguendo, defendant's standing to assert public's claim of First Amendment violation based on courtroom closure when issue failed on the merits), cert. denied, 464 U.S. 1065, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984); Tharp v. State, 362 Md. 77, 119, 763 A.2d 151 (2000) (holding that the petitioner's trial attorney had the right, as a member of the public, to challenge a courtroom closure on the public's behalf); Massachusetts v. Jaynes, 55 Mass.App.Ct. 301, 312, 770 N.E.2d 483 (2002) (declining to sua sponte raise "serious question" of whether defendant had standing to raise public's right to public trial when issue is "distinct" under state law and defendant's claim failed on the merits), review denied, 437 Mass. 1108, 774 N.E.2d 1098 (2002).
[13] The right to a public trial is based partially on the theory that the "knowledge that every criminal trial [is] subject to contemporaneous review in the forum of public opinion [will constitute] an effective restraint on possible abuse of judicial power." United States v. Kobli, 172 F.2d 919, 921 (3d Cir.1949).
[14] See, e.g., State v. Stegall, 124 Wash.2d 719, 729, 881 P.2d 979 (1994) (relying on language of court rule to hold that a defendant may waive his right to a 12-person jury); State v. Martin, 94 Wash.2d 1, 5, 614 P.2d 164 (1980) (holding that the State may not prevent a defendant from entering a guilty plea that is valid under a court rule, even in a death penalty case); State v. Williams, 85 Wash.2d 29, 32, 530 P.2d 225 (1975) (holding that the defendant may waive his right to a speedy trial under a court rule, which embodies the public's right to a speedy trial); see also Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 383-84, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (holding that, given the defendant's waiver, the public cannot demand a jury trial based on social interest in that mode of fact-finding and cannot prevent a continuance to protect speedy trial right).