# United States Court of Appeals
## For the First Circuit

No. 15-1342

CHARLES JAYNES,

Petitioner, Appellant,

v.

LISA MITCHELL,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter, Associate Justice,[*]
and Stahl, Circuit Judge.

Christine DeMaso, Assistant Federal Public Defender, with whom Federal Public Defender Office was on brief, for appellant.
Susanne Reardon, Assistant Attorney General, with whom Maura Healey, Attorney General of Massachusetts, was on brief, for appellee.

June 2, 2016

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, <u>Associate Justice</u>**.  Charles Jaynes appeals the district court's dismissal of his habeas corpus petition, filed under 28 U.S.C. § 2254.  None of Jaynes's five claims entitles him to habeas relief, and we affirm.

**I**

In the summer of 1997, Jaynes, an adult man, befriended Jeffrey Curley, a ten-year-old boy, whom Jaynes often saw in his Massachusetts neighborhood.  Jaynes drove a Cadillac and several times took Curley for rides without his parents' knowledge.  At one point, Jaynes bought a bicycle and promised to give it to Curley.  Jaynes's object in gaining Curley's confidence was to engage him in sexual acts.  If Curley refused, Jaynes told a friend, he would be taken care of.

On October 1, Jaynes, along with Salvatore Sicari, another adult, picked Curley up in the Cadillac as the boy was walking his dog.  Later that day and evening, the men bought gasoline, duct tape, a large plastic container, lime, and concrete, and traveled to an apartment that Jaynes rented in Manchester, New Hampshire, where they spent the night.  Early in the morning of October 2, the Cadillac was seen parked at the Great Works River Bridge in South Berwick, Maine, near the New Hampshire border.

That evening, Jaynes was arrested at a Massachusetts car dealership where he worked.  While he was at the police station, the police impounded the Cadillac, which had been left parked on

a public street near the dealership, and made an inventory search that yielded a driver's license with a picture of Jaynes (but a different name) and a Manchester address; two rolls of duct tape; and receipts for a bike, a plastic container, lime, and concrete.

Under police questioning, Jaynes admitted that he befriended Curley and drove him around without his parents' permission.  He also said that on the evening of October 1 he and Sicari drove to New Hampshire.  On October 3, following a confession by Sicari that implicated Jaynes, police conducted a warranted search of Jaynes's New Hampshire apartment and found lime, a label from the plastic container, and Curley's jersey smelling of gasoline.  Jaynes's fingerprint appeared on a broken spoon that had been used to mix concrete.

A few days later, Curley's body, along with bits of concrete and lime, was discovered in the Great Works River, inside a plastic container sealed with duct tape.  An autopsy revealed that the cause of death was poisoning from inhaled gasoline, redness and swelling on the boy's face and upper body indicating that a gasoline-soaked rag had been held over his nose and mouth.

Jaynes was convicted by a Massachusetts jury of kidnapping and second-degree murder, and he brought a consolidated appeal from the convictions and the denial of a new-trial motion. He claimed among other things that the trial court erred in failing to instruct the jury that the murder charge required the

- 3 -

Commonwealth to prove that harm preceding death (not just the separately charged abduction) occurred in Massachusetts, and in briefly closing the courtroom to the public, although not to Jaynes or his counsel, during parts of jury voir dire. The Massachusetts Appeals Court (MAC) affirmed, Commonwealth v. Jaynes (Jaynes I), 770 N.E.2d 483 (Mass. App. Ct. 2002), and the Supreme Judicial Court (SJC) denied Jaynes's application for leave to obtain further appellate review (ALOFAR).

Jaynes later filed a second motion for a new trial, which the trial court also denied. On appeal, Jaynes argued that inflammatory evidence of his sexual preferences was improperly admitted, evidence from the searches of his car and apartment should have been excluded, his trial counsel was ineffective, and his appellate counsel was, too. Again, the MAC affirmed, Commonwealth v. Jaynes (Jaynes II), 929 N.E.2d 1001 (table), 2010 WL 2813572 (Mass. App. Ct. 2010), and again the SJC denied Jaynes's ALOFAR.

Jaynes then came to federal court with this petition for relief on habeas corpus raising the claims just mentioned. The district court dismissed the petition and granted a certificate of appealability.

**II**

"We review the district court's decision to deny habeas relief de novo." Scott v. Gelb, 810 F.3d 94, 98 (1st Cir. 2016).

- 4 -

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), habeas relief

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"If the relevant claim has not been adjudicated on the merits in state court, we review that claim de novo." Kirwan v. Spencer, 631 F.3d 582, 586 (1st Cir. 2011).

**A**

Jaynes first claims a violation of his federal due process right recognized in In re Winship, 397 U.S. 358, 364 (1970), to require a jury finding subject to the reasonable doubt standard on every element of the crime. He cites the trial court's failure to deliver what he calls a "jurisdiction instruction," that the Commonwealth had to prove that Curley's death resulted from injury or violence that occurred in Massachusetts. This issue, however, is not properly before us, for Jaynes failed to exhaust his claim in the state courts.

Under AEDPA, with exceptions not at issue here, a habeas petitioner must "exhaust[] the remedies available in the courts of

the State" before seeking relief on a given claim in federal court. 28 U.S.C. § 2254(b)(1)(A); see also Sanchez v. Roden, 753 F.3d 279, 294 (1st Cir. 2014). This means that "a petitioner must have tendered his federal claim in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question." Sanchez, 753 F.3d at 294 (internal quotation marks omitted).

> We have identified several ways in which a petitioner may satisfy this requirement, including reliance on a specific provision of the Constitution, substantive and conspicuous presentation of a federal constitutional claim, on-point citation to federal constitutional precedents, identification of a particular right specifically guaranteed by the Constitution, and assertion of a state-law claim that is functionally identical to a federal constitutional claim. In addition, citations to state court decisions which rely on federal law or articulation of a state claim that is, as a practical matter, indistinguishable from one arising under federal law may suffice to satisfy the exhaustion requirement. The exhaustion requirement is not satisfied, though, if a petitioner has simply recited the facts underlying a state claim, where those facts might support either a federal or state claim.

Id. (citations, alterations, and internal quotation marks omitted).

Although Jaynes's first ALOFAR to the SJC claimed error in the trial court's failure to instruct the jury on causation by violence or injury in Massachusetts, it failed to raise a federal due process issue. The ALOFAR did not rely on a federal

constitutional provision, conspicuously present a constitutional claim, cite constitutional precedents, or identify a constitutional right. Jaynes argues the contrary by noting that, at one point, the ALOFAR stated that an allegedly erroneous manslaughter instruction violated Jaynes's due process right, and at a subsequent point said that clarification of the jurisdictional issue was "[s]imilarly" necessary. The word "[s]imilarly," Jaynes says, sufficiently indicated that he was raising a jurisdictional issue under the national Constitution. A look at his pleading, however, shows that the most patent problem with this argument is that the word "similarly" does not directly follow the ALOFAR's invocation of constitutional rights. Instead, it appears after a discussion of a different point on which Jaynes sought clarification of state law.

Nor did the ALOFAR assert even a state-law claim functionally identical to one under the federal Constitution, or cite state court decisions resting on federal law. Rather, the ALOFAR framed the issue as whether kidnapping by inveigling constituted the "inflict[ion]" of "violence or injury" for purposes of a Massachusetts venue statute, Mass. Gen. Laws ch. 277, § 62. This is a straightforward question of state statutory construction, not a functional allusion to Fourteenth Amendment due process.

The answer is the same to Jaynes's fallback argument that the ALOFAR is at least ambiguous with respect to a constitutional assertion, so that we may consult "backdrop" materials filed in the lower courts that reveal a federal claim. As we have said before, however, the "backdrop" approach has itself become problematical after Baldwin v. Reese, 541 U.S. 27 (2004), see e.g., Janosky v. St. Amand, 594 F.3d 39, 51 n.4 (1st Cir. 2010), but here it is enough to point out that Jaynes's very premise in raising it is faulty. As we said, the ALOFAR is not, in fact, ambiguous about raising a constitutional claim. It unambiguously does not.[1]

We add that the failure to exhaust does not appear to have cost Jaynes any relief on habeas even on his own theory that a jurisdictional issue should have gone to the jury in this case. The MAC took the following facts to have been "establish[ed] indisputably":

> [T]he kidnapping of the ten year old victim began shortly after 3:00 p.m. near his home in Cambridge. The evidence included testimony from various witnesses who saw the defendant and Sicari after 3:15 p.m. in Massachusetts but did not see the victim. A receipt showed a purchase of gasoline at 3:37 p.m. in Newton on the defendant's father's credit card, later found in possession of the defendant. There

---

[1] Jaynes requests that, if we find his due process claim unexhausted (as we do), we remand to the district court to allow him to dismiss the claim, so that the exhausted claims may proceed. Such a remand is unnecessary given that we affirm the district court's denial of the claims that Jaynes has exhausted.

was testimony that the defendant was observed at approximately 4:46 p.m. in Newton, agitated and smelling of gasoline; the victim died from gasoline inhalation. The defendant showed up with Sicari for work in Newton sometime between 5:00 and 5:30 p.m., again without the victim in sight. Other receipts showed a purchase at 9:04 p.m. in Watertown of a large plastic container subsequently used to dispose of the victim's body, and the purchase at approximately 10:20 p.m. in Somerville of a fifty pound bag of concrete. Concrete was found on the victim and in the container sunk in the river in Maine. The defendant and Sicari also bought "No-Doz" and cigars at 10:38 p.m. in Somerville. The medical examiner testified that the contents of the victim's stomach indicated a time of death before 10:30 p.m.

Jaynes I, 770 N.E.2d at 490. Nothing in Jaynes's briefs suggests that these findings would be subject to disturbance under the deferential AEDPA review, and they would clearly have met any need to satisfy the jury that fatal "violence or injury" occurred in Massachusetts, even on a narrow reading of the state statute.

**B**

Jaynes's second claim is that his constitutional right to a public trial was violated by brief courtroom closures during voir dire. Before trial, he requested that potential jurors be questioned about prior sexual abuse, attitudes toward homosexuality, and any racial biases. The trial judge informed the venire that she would be asking such questions and that, if any such question raised a legitimate privacy concern, the courtroom could be closed for that enquiry and response. Jaynes

did not object when the judge announced this plan to the venire or when she discussed it with the parties in advance of jury selection. Accordingly, the judge closed the courtroom only when a potential juror requested it, and only during the discussion of the private matter as raised in the question to that individual.

The MAC rejected Jaynes's subsequent courtroom closure claim:

> [The trial judge's] solution to the problem [was] narrowly tailored: she allowed the courtroom to be closed in response only to specific requests made by potential jurors to protect their privacy, and only during the discussion of private matters; she immediately reopened the courtroom for any additional questioning of each of the potential jurors once questioning on the private matters was completed. She also adequately articulated the basis for the brief closures in order to permit meaningful appellate review.

Id. at 492. Despite Jaynes's protest to the contrary, the MAC's decision is not an unreasonable application of Waller v. Georgia, 467 U.S. 39, 48 (1984), according to which, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure."

Jaynes's argument comprises three particular objections, the first being that the trial court closed the courtroom sua

- 10 -

sponte rather than at the request of a party.  But this is not an accurate description.  On the verge of engaging in direct, individual questioning of the potential jurors, the judge recognized that honest answers on the subjects in issue might well embarrass or shame the person being examined.  She therefore offered to close the courtroom temporarily to minimize the audience for a disclosure the individual found threatening.  But she did not close the room sua sponte; she did so only when a person to be questioned requested it in anticipation of a response that could well be personally awkward.  To be sure, a prospective juror is not a "party" in the strict sense of the prosecution or defendant.  But it is a reasonable reading of Waller to include a potential juror as eligible to make the request.  Although in most instances anticipation of a justification to close will be known by a named party's counsel, who will raise the matter, in questioning for juror qualification only the individual being examined will normally know of a reason to seek discreet consideration and no one else is able to ask for it.  So, it is fair to read Waller broadly enough to allow for a potential juror's request for closure, and no clearly established federal law holds otherwise.

Jaynes also says that the trial court failed to consider reasonable alternatives, but the MAC reasonably determined that the judge's solution was narrowly tailored and noted that Jaynes had not objected or suggested any alternative measures.  If he had

done so, the most obvious alternative would have been side-bar questioning outside the hearing of courtroom spectators, and in functional terms the limited closure ordered by the trial judge was nothing more.  See Wilder v. United States, 806 F.3d 653, 660 (1st Cir. 2015).  Indeed, the practice employed here falls just barely within the outer reaches of the procedure Waller was meant to regulate.

Finally, Jaynes faults the trial court for failing to articulate findings that specifically justified each closure.  But nothing in clearly established Supreme Court precedent requires that, in circumstances like those before us, repeated findings be made at a particular level of specificity, so long as an individual's request plausibly falls within an announced category of the embarrassing subjects deserving privacy.  Here, the trial judge noted in advance the subjects of questions that could fairly prompt privacy concerns and raise the risk of dishonest answers, and she closed the courtroom on request only when a question on one of those limited topics was about to be addressed and the individual questioned sought privacy.  In practical terms, requiring more could potentially have forced a public disclosure to the effect that the objecting person had been sexually abused, or was secretly a bigot, which would have defeated the whole purpose of a limited, justifiable closure.  Jaynes has cited no

federal law at odds with the state courts' common sense in dealing with the subject.

## C

Jaynes's next point is that the introduction of evidence of his pedophilia violated his due process right to a fair trial, and he lists what he says were the trial court's erroneous admissions of irrelevant and unfairly prejudicial evidence: some of his own personal writings with pedophilic expressions; testimony about his comments on boys, including Curley, and his illicit intentions toward them; testimony about his interest in the North American Man Boy Love Association (NAMBLA) and in a certain film showing a naked boy; and a statement by one witness that Jaynes was a "pedophile."

The parties dispute whether the MAC decided this claim on the merits, so as to call for deferential AEDPA review, but we need not resolve this dispute, since Jaynes's claim fails even when reviewed de novo.

We have said before that

> [a]n erroneous evidentiary ruling that results in a fundamentally unfair trial may constitute a due process violation and thus provide a basis for habeas relief. However, to give rise to habeas relief, the state court's application of state law must be so arbitrary or capricious as to constitute an independent due process violation. To be a constitutional violation, a state evidentiary error must so infuse the trial with inflammatory prejudice that it renders a fair trial impossible.

- 13 -

<u>Lyons</u> v. <u>Brady</u>, 666 F.3d 51, 55-56 (1st Cir. 2012) (citations, alterations, and internal quotation marks omitted).

Here, the high due process bar has not been cleared. The trial court gave the jury a limiting instruction that evidence of prior bad acts or statements could be considered only for its bearing on Jaynes's knowledge, motive, intent, or method if the jurors found he had committed the act charged, and the judge instantly instructed the jury to disregard the "pedophile" comment. As so limited, the writings in evidence were relevant to Jaynes's motive and intent, and defense counsel on cross-examination and during summation was able to question their probative value. The testimony indicating Jaynes's intentions went to rebut his story that he would never act on his fantasies, and the statements about Jaynes's interests in NAMBLA and the film were limited to brief exchanges subject to the restrictive instruction.

### D

Jaynes turns from judicial rulings to the conduct of his defense, in claiming ineffectiveness of his trial counsel for failing to move to suppress certain evidence, to request a jurisdiction instruction, and to object to the courtroom closure.

> Ineffective-assistance claims are governed by the Supreme Court's decision in <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984), under which the defendant must prove two elements. First,

> the defendant must show that counsel's performance was deficient, which requires showing that counsel's performance was not only substandard, but also deficient in some way sufficiently substantial to deny him effective representation. Second, the defendant must show that the deficient performance prejudiced the defense, which requires proof that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Logan v. Gelb, 790 F.3d 65, 71 (1st Cir. 2015) (per curiam) (citations and internal quotation marks omitted).

"[W]hen a federal court reviews an ineffective assistance of counsel claim under § 2254, it must use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt. This is an extremely difficult standard to meet . . . ." Pena v. Dickhaut, 736 F.3d 600, 606 (1st Cir. 2013) (citations and internal quotation marks omitted). "[T]he pivotal question in a federal collateral attack under Strickland is not whether defense counsel's performance fell below Strickland's standard, but whether the state court's application of the Strickland standard was unreasonable, that is, whether fairminded jurists would all agree that the decision was unreasonable." Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011) (citations and internal quotation marks omitted).

**1**

"[W]here the alleged ineffectiveness was the failure to file a motion to suppress, in order to show prejudice the defendant must prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different had the challenged evidence been excluded." United States v. Mercedes-De La Cruz, 787 F.3d 61, 67 (1st Cir. 2015) (internal quotation marks omitted).

Jaynes contends that the impoundment of the car, with its ensuing inventory search, was unconstitutional and that any evidence so discovered was suppressible. Because evidence discovered during that search was used to obtain warrants to search the car a second time and to search the New Hampshire apartment, he further argues that any evidence found during those searches was also excludable. According to Jaynes, his trial counsel was deficient for filing no motions to suppress this evidence.

The MAC decided that Jaynes suffered no prejudice from want of a motion to suppress the evidence found inside the vehicle because such a motion would not have succeeded:

> [B]y the time the Cadillac had been towed, it had been parked for at least three hours on a street where only two hour parking was permitted. The defendant, who was under arrest, was unable to move the vehicle that was now in violation of that parking restriction and the record does not reveal that anyone else had come forward to take possession of the vehicle. In these

circumstances, the police were permitted to impound the vehicle.

Jaynes II, 2010 WL 2813572, at *4.

Jaynes invokes both paragraphs of 28 U.S.C. § 2254(d) in contending that the MAC's adjudication (1) constitutes an unreasonable application of clearly established federal law regarding impoundments, and (2) is based on an unreasonable determination of the facts. To start with the latter, the thrust of Jaynes's argument is that the car was not parked illegally because, as a legal fact, the two-hour limit did not apply after 7pm: thus it could not have been impounded on the ground claimed. But we have no need to enquire into this dispute because, even if the car could not have been impounded for a parking violation, a motion to suppress would almost certainly have been unsuccessful.

As the MAC recognized, the impoundment was supportable on a basis unrelated to limits on parking duration: "Courts have upheld the impoundment of a car from the lot associated with the arrest location when accompanied by such circumstances as threats of vandalism, parking restrictions, police liability concerns, or the inability of the defendant or another later to move the car." Id. at *3. Under the community caretaking exception to the Fourth Amendment warrant requirement, police may "impound a vehicle for noninvestigatory purposes when it is reasonable to do so (say, to remove an impediment to traffic or to protect a vehicle from theft

or vandalism)." United States v. Sanchez, 612 F.3d 1, 4 n.2 (1st Cir. 2010). "Case law supports the view that where a driver is arrested and there is no one immediately on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car." Vega-Encarnación v. Babilonia, 344 F.3d 37, 41 (1st Cir. 2003). With Jaynes detained for an indeterminate period at the police station, and with no one immediately forthcoming to take possession, the police could reasonably enough have concluded that the car, which, incidentally, would have incurred a parking violation eventually, needed to be moved.

Once a car is impounded, an inventory search follows as a matter of course in prudent law enforcement practice, if for no other reason than to make a record to protect the police against a later claim that custodial negligence allowed the loss of valuable personal property by theft or otherwise. See Whren v. United States, 517 U.S. 806, 811 n.1 (1996) ("An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage."). Such was the practice undisputedly followed here. Hence, the doubly deferential standard of review is not even required to sustain the MAC's conclusion that Jaynes could show no deficiency of competence in trial counsel's failure to

object to admitting the fruits of the inventory search, and the Massachusetts courts did not unreasonably apply federal law.[2]

Jaynes also contends that even if the inventory search had been legal there should have been a request to suppress the evidence discovered in the apartment for an independent reason: the "nexus element" was not satisfied in support of the warrant to search there. "Prior to executing a search, police officers, with some exceptions, must obtain a search warrant supported by probable cause to believe that (1) a crime has been committed, and (2) that enumerated evidence of the crime will be found at the place to be searched--the so-called nexus element." United States v. Joubert, 778 F.3d 247, 251 (1st Cir. 2015) (alterations and internal quotation marks omitted).

> When evaluating the nexus between the object and the location of the search, a magistrate judge has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched. The government does not need to show that the belief is

<hr />

[2] Our conclusion, that the MAC's adjudication of the ineffective-assistance claim did not result in an unreasonable application of federal law, forestalls Jaynes's assertion that the federal district court erred in failing to hold an evidentiary hearing. See Cullen v. Pinholster, 563 U.S. 170, 183 (2011) ("[W]hen the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing." (internal quotation marks omitted)).

necessarily correct or more likely true than false. . . . The reviewing court's duty is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

Id. at 251-52 (citations, alterations, omissions, and internal quotation marks omitted).

Here, there is no serious question about the state court's finding of a substantial basis to infer nexus. The warrant application included a police officer's attestation that Jaynes said he had driven to New Hampshire with Sicari on the night of October 1. The affidavit catalogued the items found in the car, including the license with Jaynes's picture, apparently assumed name, and the address of the New Hampshire apartment. Finally, the officer represented that Sicari confessed to taking Curley's body to Jaynes's New Hampshire apartment.

**2**

Jaynes contends that trial counsel was also ineffective for failing to request a jurisdiction instruction and to object to the courtroom closures. When faced with these ineffective-assistance issues in Jaynes II, the MAC responded that the underlying "claims have already been rejected by this court and fare no better newly attired in the garb of ineffective assistance of counsel." 2010 WL 2813572, at *4 (internal quotation marks omitted).

That this determination was neither contrary to nor an unreasonable application of federal law is especially evident under the doubly deferential standard of review. With respect to the jurisdiction-instruction claim, the MAC disposed of it in Jaynes I under state law, concluding, based on state statutes and cases, that the trial judge did not err in keeping from the jury the question of jurisdiction. 770 N.E.2d at 489-90. The MAC in Jaynes II thus did not abrogate any principle of clearly established federal law in failing to relitigate an issue on which Jaynes had already had his opportunity, or (as our own discussion of the relevant evidence indicates) in determining that Jaynes was not prejudiced by his counsel's failure to request the jurisdiction instruction. And as to the courtroom-closure claim, our prior examination of it reveals that Jaynes could not show the requisite prejudice, even assuming arguendo that his trial counsel was deficient for failing to raise it.

**E**

Finally, Jaynes asserts that his appellate counsel was ineffective for failing to raise claims about ineffective assistance of trial counsel and the admission of inflammatory evidence. The MAC responded that Jaynes "has not shown how better work [by appellate counsel] could have accomplished something material for the defense." Jaynes II, 2010 WL 2813572, at *4. As our own dispositions and discussions of the underlying claims

indicate, this determination was neither contrary to nor an unreasonable application of clearly established federal law, and rested on no vulnerable finding of fact.

### III

The judgment of the district court is AFFIRMED.