# United States Court of Appeals
## For the First Circuit

No. 17-1692

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH DAVIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Joshua L. Gordon for appellant.
Scott W. Murray, United States Attorney, with whom Seth R. Aframe, Assistant United States Attorney, was on brief, for appellee.

November 20, 2018

**STAHL**, **Circuit Judge**.  Defendant Joseph Davis was convicted after a two-day bench trial of one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  Davis raises two issues in this appeal.  First, he contends that the district court erred in denying his motion to suppress the handgun in question, which he claims was discovered during an unconstitutional search of his vehicle.  Judge Joseph A. DiClerico, Jr., denied that motion and conducted Davis's first trial.  That trial was held before a jury, which deadlocked on the sole charge.  Davis was then retried in a bench trial held before Judge Landya B. McCafferty, who found him guilty.  Davis argues that his conviction was not supported by sufficient evidence of his knowing and intentional possession of the weapon.  After careful consideration, we affirm both the denial of the suppression motion and Davis's conviction.

## I.  Factual Background and Prior Proceedings

We summarize the facts in two parts.  First, we describe those events relevant to Davis's arrest and the subsequent search of the car, which are recounted "as the trial court found them, consistent with record support."  United States v. Andrade, 551 F.3d 103, 106 (1st Cir. 2008) (quotation marks and citation omitted).  We then recite the facts related specifically to Davis's conviction for possession of a firearm by a felon, which are taken "from the trial transcript and present[ed] [] in the light most

favorable to the judgment of the court . . . ." United States v. Grace, 367 F.3d 29, 31 (1st Cir. 2004).  The procedural facts are undisputed.

**A.**

The events at issue stem from Davis's arrest in the early hours of July 2, 2016.  Davis, a musician, performed at a Hampton, New Hampshire, bar on the evening of July 1, 2016.  Davis left the bar following the show but, needing to use the restroom, attempted to return a short while later and was rebuffed on the basis of the bar's no-reentry policy.  Instead, Davis obtained the keys to his then-fiancée's vehicle (the "Vehicle") from his brother and, without anyone else in the car, drove a short distance in search of a restroom.

Three officers of the Hampton Police Department ("HPD"), Detective Robinson, and Officers Zigler and Hood, in two separate police vehicles, observed the Vehicle leaving the bar and watched it travel, without headlights on, to a nearby parking lot.  Once there, Davis stopped the Vehicle perpendicularly across a designated handicap parking spot.  At that point, the police officers pulled into the lot behind the Vehicle, activated their emergency lights, and approached on foot.

As he neared the Vehicle, Robinson observed a number of potential signs that Davis was driving under the influence of

alcohol and/or marijuana.[1]  Robinson informed Davis that he had been driving without his headlights on and inquired whether he had consumed any alcohol that evening.  While Davis attributed his erratic driving to his urgent need to use the restroom, Robinson suspected that Davis was impaired and took Davis's license to his cruiser to conduct a background check.  Zigler and Hood remained with Davis and the Vehicle.

After the background check indicated that the Vehicle was not registered to Davis, Robinson requested that he step out of the Vehicle.  Davis appeared to have difficulty walking, and admitted to having had several drinks at the bar following his performance.  Zigler also noted a bottle of alcohol in the car door as Davis opened it.  Davis failed two of three "field sobriety" tests administered by the officers, and Robinson arrested him on suspicion of driving while intoxicated.[2]  The officers then handcuffed Davis and placed him in one of the police vehicles.

Following Davis's arrest, the police officers contacted a tow truck to remove the Vehicle.  The HPD has a "Motor Vehicle Inventory Search Policy" that dictates guidelines for "conducting

---

[1] Specifically, Robinson testified that he noted the smell of alcohol and marijuana coming from the Vehicle and saw on the console several disposable cups partially filled with liquid.

[2] Davis has not contested the legality of his arrest in this appeal, and he did not do so below.

a search . . . for the purpose of making an inventory of the contents of a motor vehicle [directed to be] towed by the members of the [HPD]."  Under that policy, officers are required to conduct an inventory search whenever, <u>inter</u> <u>alia</u>,

> 1. The vehicle is being towed under orders of a department member when the owner or custodian of the vehicle is under arrest.
>
> 2. The vehicle is towed under orders of a department member because the driver of the vehicle is under arrest and the owner or custodian is not present . . . .
>
>    . . .
>
> 6. The vehicle is illegally parked and is a hazard to traffic if allowed to remain.

Robinson and Zigler testified that, when a driver is arrested for driving under the influence, HPD policy calls for the vehicle to be towed.  However, both officers also stated that they sometimes permit an unimpaired, licensed person authorized by the arrestee to take the vehicle themselves in order to save the arrestee the cost of a tow.  In this instance, the officers stated that two individuals came forward at the scene of the arrest and identified themselves as Davis's friends but refused Robinson's offer that they take the Vehicle away on Davis's behalf.[3]

---

[3] At the suppression hearing, Aaron Bruton testified that he was one of the individuals who approached the officers.  He stated that he had not directly refused to take the Vehicle, but that he did seek to contact the Vehicle's owner and others for that purpose.

While waiting for the tow truck, Zigler entered the Vehicle to seize the bottle and cups in plain view.[4]  Zigler then conducted an "inventory search" of the Vehicle as required by the policy quoted above, adding several items to an inventory form but leaving them in the Vehicle's locked trunk.[5]

At some point after finishing the inventory search, Zigler reached into the Vehicle to place the keys in the ignition for retrieval by the tow truck operator.  While doing so, Zigler for the first time saw a handgun located between the driver's seat and the center console.  Zigler removed the weapon from the Vehicle and noted that it was loaded and had the safety turned off.  After unloading it and securing the safety, Zigler brought the handgun to the police station.  Zigler testified that he took the weapon both out of concern for public safety and out of reluctance to leave an item of value in the Vehicle.

On October 19, 2016, Davis was charged with being a felon in possession of a firearm in the District of New Hampshire.[6]  On November 23, 2016, he moved to suppress the handgun on the basis

---

[4] Zigler also seized a jar that he believed contained marijuana.  Neither that seizure nor that of the alcohol and cups are at issue in this appeal.

[5] Specifically, Zigler discovered and noted on the inventory sheet a purse and wallet that belonged to Davis's fiancée.

[6] Davis was originally charged with several state crimes as well, but those charges were dropped.

that the search of the Vehicle resulting in its discovery was unconstitutional. The district court held two days of hearings, and ultimately denied Davis's motion on the basis that the handgun in question was discovered pursuant to the community caretaking exception. In doing so, the court credited testimony from Robinson and Zigler that the Vehicle was illegally parked and posed a traffic hazard, and that no viable, willing drivers presented themselves to remove the Vehicle at the time of Davis's arrest. The district court also credited Zigler's testimony that, when he discovered the handgun in the Vehicle, he was reaching back into the car to place the keys in the ignition for the purpose of facilitating the tow, rather than acting for an investigatory purpose.

**B.**

Davis's first trial, conducted before a jury with Judge DiClerico presiding, began in January 2017 and resulted in a mistrial as the jury hung on the sole charge. The parties then consented to a bench trial, which took place on March 9 and 10, 2017.[7]

All three police officers testified in the government's case-in-chief and provided additional details regarding the night of Davis's arrest. Both Robinson and Zigler testified that, while

---

[7] Following the mistrial, Judge DiClerico recused himself from further participation in the case.

Davis was in the Vehicle and being questioned, they observed that Davis repeatedly moved his right hand towards his right pocket or hip. Those officers testified that they viewed this movement as potential "indexing," or subconscious gesturing towards an item that Davis wished to conceal. In this instance, Robinson and Zigler stated that Davis appeared to be "indexing" in the direction of the Vehicle's center console, which contained cups partially filled with liquid and, as Zigler later discovered, the handgun at issue. Those officers also testified that, while he was in the Vehicle, Davis threw the scarf or bandana that he was wearing[8] over the center console, partially obscuring the console and the area where Zigler subsequently found the handgun. Both Robinson and Zigler testified that, in their opinion, these actions demonstrated that Davis was aware of the handgun and was attempting to prevent the officers from discovering it.

Robinson and Zigler also testified about Davis's actions at the police station. According to both officers, when Zigler initially confronted Davis with the handgun, Davis first asserted that he had a permit for the weapon, then quickly corrected himself and stated that his fiancée had a permit for it. Moreover, Robinson and Zigler indicated that when Davis overheard them discussing the potential for charging him with being a felon in

_____

[8] Davis testified that he wore the scarf as part of an outfit for his performance earlier in the evening.

- 8 -

possession, he protested "something along the lines [of], whoa, you can't charge me with being in possession of [the handgun], I was just driving [the car]."  Again, Zigler and Robinson stated that these comments suggest that Davis "seemed to know that, yes, he knew about the weapon[,] he knew that it belonged to his wife[9] . . . [and] he knew that there was a weapon there."[10]

After the court denied his motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, Davis testified in his own defense.  He stated that both the weapon and the Vehicle belonged to his fiancée and that he had no knowledge that his fiancée owned the weapon or that it was in the Vehicle prior to his arrest.  He also indicated that his fiancée generally did not permit others to operate the Vehicle, but that he had regular access to it for tasks such as bringing his fiancée's daughter to and from school and running errands outside of the home.

Davis testified that, on the day of his arrest, his fiancée drove the Vehicle from Manchester to Hampton while he sat

---

[9] Zigler's reference to Davis's "wife" appears to be mistaken, as Davis and his fiancée were not married until September of 2016.

[10] Of note, in his testimony, Hood stated that he recalled Davis stating only that the handgun belonged to his "girlfriend," without specific reference to a permit.  Hood did not recall Davis stating that he had a permit for the handgun or that he was only driving with the handgun, nor did he recall seeing Davis "indexing."

in the passenger seat. Upon arrival, Davis stated that several other individuals assisted in unloading music equipment from the Vehicle, and that his fiancée left the keys to the Vehicle behind to allow them to do so.

While he generally corroborated the officers' narrative of his arrest, Davis contested a number of Robinson's and Zigler's claims. Davis testified that he removed his scarf only once he had stepped out of the Vehicle and stated that he threw it onto the driver's seat without any purpose to hide either the cups or handgun. He denied stating that he had a permit for the weapon and indicated that his statement that his fiancée had a permit for the weapon was phrased speculatively. He also testified that, on hearing about the potential felon-in-possession charge, he protested only that he was not in possession of the handgun and did not make any statement suggesting that he knew it was in the Vehicle.

At the close of evidence, the court delivered its verdict from the bench, finding Davis guilty of knowing[11] possession and elaborating on its reasoning. The court opened by noting that "if I . . . looked just at the government's case without your

---

[11] The court noted that only knowing possession was in dispute, as the parties stipulated to the other two elements of the felon-in-possession charge — previous conviction of a felony and passing of the weapon through interstate commerce — at trial. Those elements are not at issue in this appeal.

testimony, I may well not have found the evidence sufficient to convict." The court continued, however, that it did not credit Davis's testimony on several potentially exculpatory points. The court particularly emphasized its disbelief of Davis's claimed unawareness that his fiancée owned the weapon, finding that assertion to be contradicted by his admitted statement to police that she had a permit for the weapon, the fact that the weapon was loaded and ready to fire when found, and his extended time with his fiancée in the Vehicle earlier in the day. From this, the court stated that "[b]ecause I found your testimony incredible, I do not believe your ultimate denial; that is, that you did not know of the gun's presence next to you in the car." Further, the court credited the officers' testimony that Davis was "indexing" and had attempted to conceal the area of the handgun with his scarf, and found that this testimony supported the conclusion that he had knowing possession of the weapon. Based on this evidence, the court concluded the charge was proven beyond a reasonable doubt.

Following his conviction, the court sentenced Davis to, inter alia, 50 months' incarceration. This timely appeal followed.

## II. Discussion

Davis raises two issues on appeal. First, he argues that the district court erred in denying his motion to suppress the weapon, which he contends was the fruit of an unlawful search.

- 11 -

Second, he claims that the evidence adduced at trial was insufficient to sustain the verdict against him. We address these claims in order.

**A.**

Davis raises two arguments in support of his contention that the search of the Vehicle was unconstitutional. His first point is a compound one: Davis claims that the impoundment was unconstitutional because it was left to police discretion and, if the impoundment was unconstitutional, then Zigler's entry into the vehicle to put the keys in the ignition in furtherance of the impoundment (which resulted in seizure of the handgun) was also unconstitutional. Second, Davis separately contends that Zigler's entry into the Vehicle to put the keys in the ignition was pretext for an unconstitutional investigatory search.

In reviewing the denial of a motion to suppress, the court accepts the district court's "factual findings to the extent that they are not clearly erroneous," and "review[s] its legal conclusions de novo." United States v. Sanchez, 612 F.3d 1, 4 (1st Cir. 2010).

As to Davis's first argument, we conclude that the officers' decision to impound the Vehicle was constitutional. Vehicle impoundments by police are viewed through the lens of the "community caretaking" exception to the Fourth Amendment's warrant requirement. United States v. Coccia, 446 F.3d 233, 238 (1st Cir.

2006). "The community caretaking exception recognizes that the police perform a multitude of community functions apart from investigating crime[,]" including, as relevant here, "remov[ing] vehicles that impede traffic or threaten public safety and convenience." Id. (citing S. Dakota v. Opperman, 428 U.S. 364, 368-69 (1976)); see also Sanchez, 612 F.3d at 7 (Lynch, C.J., concurring) ("Courts have regularly upheld warrantless vehicle impoundments when police are acting not as investigators but as community caretakers, responsible for protecting public safety and preventing hazards by removing vehicles that impede traffic, risk vandalism, or create inconvenience."). In order to comport with the Fourth Amendment, decisions to impound a vehicle must be "reasonable under the circumstances," considering "all the facts and circumstances of a given case." Coccia, 446 F.3d at 239. Under this evaluation, "[c]ourts have upheld the impoundment of a car from the lot associated with the arrest location when accompanied by such circumstances as threats of vandalism, parking restrictions, police liability concerns, or the inability of the defendant or another later to move the car." Jaynes v. Mitchell, 824 F.3d 187, 197 (1st Cir. 2016) (quotation marks and citation omitted). Where impoundment is reasonable under the circumstances, the fact that police may also have an investigatory motive or "alternative[,] . . . less intrusive means" of addressing the vehicle does not render the seizure impermissible. Boudreau

- 13 -

v. Lussier, 901 F.3d 65, 72 (1st Cir. 2018) (quoting United States v. Rodriguez-Morales, 929 F.2d 780, 786 (1st Cir. 1991)). Likewise, while the existence of standardized procedures are relevant to that evaluation, "explicit criteria" are not required where "the police have solid, noninvestigatory reasons for impounding a car." Rodriguez-Morales, 929 F.2d at 787.

Once a vehicle is impounded, the Fourth Amendment further permits police to conduct an "inventory search" to identify the contents of the vehicle without first obtaining a warrant. See Jaynes, 824 F.3d at 197; see generally Florida v. Wells, 495 U.S. 1 (1990). The purpose of that exception is "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1987).

Davis's argument fails when tested against these standards. The standard for vehicle impoundments explicitly contemplates room for police discretion based on the circumstances. See, e.g., Rodriguez-Morales, 929 F.2d at 787 ("[Officers] must be free to follow 'sound police procedure,' that is, to choose freely among the available options, so long as the option is within the universe of reasonable choices." (internal citation omitted)). And the police decision to impound the Vehicle was otherwise "reasonable under the circumstances." Coccia, 446

- 14 -

F.3d at 239. The arresting officers' testimony, credited by the district court, indicates that the police believed the Vehicle could pose a potential public safety hazard and no other driver was evidently present to move the Vehicle for Davis. Other decisions in this circuit have repeatedly upheld impoundments under similar circumstances as reasonable. See Jaynes, 824 F.3d at 197 ("With Jaynes detained for an indeterminate period at the police station, and with no one immediately forthcoming to take possession, the police could reasonably enough have concluded that the car, which, incidentally, would have incurred a parking violation eventually, needed to be moved."); Coccia, 446 F.3d at 240 (concluding impoundment was reasonable based on, inter alia, the need to preserve contents of the vehicle and lack of obvious alternative means of removing the vehicle). Given the circumstances as described in the officers' credited testimony, including that the Vehicle was parked perpendicularly across a handicap parking spot (an obvious hazard), they acted reasonably in seizing the Vehicle following Davis's arrest.

Finally, Davis's alternative argument that the handgun should be suppressed because it was discovered and seized after the inventory search was completed is unavailing. The fact that the weapon was not found during an inventory search does not end our inquiry: the relevant question under the Fourth Amendment is whether a challenged search or seizure was "reasonable." See,

- 15 -

e.g., Terry v. Ohio, 392 U.S. 1, 19 (1968) ("[T]he central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security."). The district court supportably credited Zigler's testimony that (1) he reentered the Vehicle only to facilitate the towing and, by extension, to safeguard the seized Vehicle; and (2) he seized the weapon for the purposes of preserving Davis's valuable property and protecting public safety. The court's credibility determination disposes of Davis's claim, as these purposes fit neatly within the bases for treating other police exercises of their community caretaking function as "reasonable." Cf. Bertine, 479 U.S. at 372 (stating that the reasonableness of warrantless inventory searches is based on their non-investigative purposes of "protect[ing] an owner's property while it is in the custody of the police, [] insur[ing] against claims of lost, stolen, or vandalized property, and [] guard[ing] the police from danger"); Jaynes, 824 F.3d at 197 (stating that the reasonableness of impoundments is based, in part, on "policy liability concerns"). Accordingly, we see no basis on which to suppress the handgun.

**B.**

Davis next contends that there is insufficient evidence of his knowledge of the handgun, arguing that his knowledge of and intent to control the weapon were not proven beyond a reasonable

- 16 -

doubt.  In particular, Davis points to the short duration of time during which he was in the Vehicle and the fact that he did not own the weapon.  He also asserts that the inferences drawn by the district court in announcing its verdict were not "rational[] factfinding."  In response, the Government notes testimony by the arresting officers, credited by the court, that Davis attempted to conceal the weapon and made statements at the police station that indicated familiarity with the weapon, and the court's conclusion that Davis's testimony on various exculpatory details was not credible.

This court recently summarized the standard for evaluating convictions resulting from a bench trial:

> We review a bench trial conviction de novo, examining the facts and inferences in the light most favorable to the verdict.  The ultimate question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This court need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record.

United States v. O'Donnell, 840 F.3d 15, 18 (1st Cir. 2016) (internal quotation marks, citations, and alterations omitted).

In a firearms case, the Government may satisfy its burden to show knowing possession by showing that the defendant had "constructive possession" of the weapon.  United States v. Wight,

- 17 -

968 F.2d 1393, 1398 (1st Cir. 1992). "Constructive possession 'exists when a person knowingly has the power and intention at a given time to exercise dominion or control over the area where the contraband is found.'" United States v. Robinson, 473 F.3d 387, 398-99 (1st Cir. 2007) (quoting United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005)). In the context of firearms, this "may be established by showing that the person knows (or has reason to know) that the firearm is within easy reach, so that he can take actual possession of it virtually at will." Id. at 399 (quotation marks and citation omitted). The actual knowledge and intent to control required by this standard may be proven by circumstantial evidence. See United States v. Ridolfi, 768 F.3d 57, 62 (1st Cir. 2014). "[M]ere presence with or proximity to weapons . . . is insufficient to circumstantially establish constructive possession," and must be connected with "some action, some word, or some conduct that links the individual to the contraband and indicates that he had some stake in it, some power over it." United States v. Fernandez-Jorge, 894 F.3d 36, 43-44 (1st Cir. 2018) (internal quotation marks and citations omitted). "[E]vidence of an individual's control over the area where the contraband is found," however, is "valid circumstantial evidence of constructive possession." Id. at 44 (internal quotation marks and citation omitted).

Viewed in the light most favorable to the verdict, the evidence at trial supports the reasonable inference that Davis constructively possessed the weapon at issue.  Contrary to Davis's assertion, the conviction was not based solely on his "mere presence with or proximity to" the handgun, but was supported by "conduct that link[ed Davis] to the contraband and indicate[d] that he had some stake in it, some power over it."  Id. at 43-44 (internal quotation marks and citation omitted).  The court's conclusion is supported by circumstances permitting an inference that Davis was aware of the weapon's placement:  he enjoyed a close relationship with the Vehicle's owner and had regular access to the car, and his post-arrest statements that he or his fiancée had a permit for the weapon and that he was "only driving" with it could reasonably be interpreted as demonstrating his awareness of both the handgun's existence and its presence in the Vehicle.  See Robinson, 473 F.3d at 399 (finding the defendant's relationship with driver, access to keys, and post-arrest statements suggesting knowledge of weapon were circumstantial evidence of unlawful possession).  Likewise, Davis's apparently furtive actions in the Vehicle could be reasonably interpreted as suggesting that he was aware of the weapon even before it was noticed or raised to his attention by the arresting officers.  Taken together, these facts support the reasonable inference that Davis knew of the weapon's presence and intended to exercise dominion and control over the

weapon at the time of his arrest.  Id. ("Constructive possession of a firearm may be established by showing that the person knows (or has reason to know) that the firearm is within easy reach, so that he can take actual possession of it virtually at will." (quotation marks and citation omitted)).

Moreover, the district court did not err in concluding that Davis's perceived lack of credibility bolstered its finding of guilt.  Davis argues that, given the district court's concession that the evidence prior to his testimony might not have supported a guilty verdict, it was irrational for the court to put him in a worse position based on his denials of those facts.  This argument misunderstands the district court's position.  The district court did not simply discount Davis's testimony but found that his incredible declarations suggested consciousness of guilt.  It is a "well-settled principle that false exculpatory statements are evidence —— often strong evidence —— of guilt."  Al-Adahi v. Obama, 613 F.3d 1102, 1107 (D.C. Cir. 2010); cf. also Ridolfi, 768 F.3d at 63 (discussing how probative value of defendant's false statements to police following arrest supported conviction).  The district judge espoused precisely this principle, stating "[b]ecause I found your testimony incredible, I do not believe your ultimate denial; that is, that you did not know of the gun's presence next to you in the car."

Accordingly, we conclude that the district court based its verdict on sufficient evidence and find no error in Davis's conviction.

### III. Conclusion

For the foregoing reasons, the district court's order denying the motion to suppress and Davis's conviction are AFFIRMED.